# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. LeFlore*, 2013 IL App (2d) 100659

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH W. LeFLORE, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-0659 |
| Filed | September 17, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for aggravated robbery, robbery and burglary were reversed and the cause was remanded for a new trial where the trial court failed to comply with Supreme Court Rule 401(a) by not advising defendant that he was eligible for a maximum term of 6 to 30 years' imprisonment, based on his eligibility for Class X sentencing, when he waived his right to counsel; furthermore, the denial of his motion to quash his arrest and suppress evidence was vacated and the cause was remanded for a hearing on the issue of whether defendant had standing to challenge the use of a GPS device on a vehicle he allegedly used. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 09-CF-1251; the Hon. Allen M. Anderson, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Thomas A. Lilien and Darren E. Miller, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Edward R. Psenicka, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.

Justice McLaren concurred in the judgment and opinion.

Justice Birkett concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    Following a jury trial, defendant, Keith W. LeFlore, was found guilty of aggravated robbery (720 ILCS 5/18-5(a) (West 2008)), robbery (720 ILCS 5/18-1(a) (West 2008)), and burglary (720 ILCS 5/19-1(a) (West 2008)). The trial court entered judgment on the aggravated robbery charge and sentenced defendant to 20 years in prison. Defendant now appeals from his conviction, arguing that (1) the trial court failed to properly admonish him under Illinois Supreme Court Rule 401(a) (eff. July 1, 1984); and (2) the trial court erred in denying his motion to quash his arrest and suppress evidence. We reverse and remand for a new trial.

¶ 2                                      I. BACKGROUND

¶ 3    Defendant was charged on April 26, 2009, in connection with the April 24 robbery of a Mobil gas station in Aurora. The public defender was assigned to represent him at his initial appearance in bond court. When defendant was arraigned on May 21, the trial court admonished him that the first count, charging aggravated robbery, "is a Class 1 felony. A Class 1 felony is a one [*sic*], or four to 15-year possible sentence [in the] Department of Corrections." Further, after conferring with the State, the trial court informed defendant that, because of his "past record," it was a nonprobationable offense. The court admonished defendant about the robbery and burglary charges, including the facts that they might be nonprobationable and "extended term eligible" such that the normal sentencing range of 3 to 7 years could be extended to 3 to 14 years, again based on his past record.

¶ 4    On July 8, 2009, defendant filed a motion to quash his arrest and suppress evidence. Defendant's motion argued that the Aurora police department covertly placed a GPS tracking device on a vehicle regularly driven by defendant and used the GPS device to monitor the

vehicle's movements. The motion argued that "it was solely through information received from the GPS tracking device" that defendant became a suspect in the robbery, and because the officers did not have a warrant, placing the GPS device on the vehicle constituted an unlawful search under the United States and Illinois Constitutions.

¶ 5    On July 22, 2009, the trial court conducted a hearing on defendant's motion. Defendant called Officer Jeremy Shufelt, a police officer with the Aurora police department, as a witness. Shufelt testified that, in April 2009, he received an anonymous tip from the Aurora Crime Stoppers that defendant "was possibly" committing burglaries and that the tipster had observed defendant bringing items into his apartment complex. Shufelt testified that, after checking through various records systems, he discovered that defendant was on parole at the time and that his listed parole address was an apartment in Aurora. Shufelt testified that he was able "to connect" defendant to a red Kia Spectra that was registered to Stephanie Powell, who lived at the same address as defendant.

¶ 6    Shufelt further testified that he, along with other members of the Aurora police department, decided to place a GPS tracking device on the vehicle. Shufelt testified that, a few days later, another police officer dropped him off about a block and a half from defendant's apartment at approximately 3:50 a.m. Shufelt placed the GPS device on the vehicle, which was parked in a parking lot that was accessible to the public. Shufelt testified that the GPS device transmitted a signal to a satellite that sent a signal to a server, allowing the GPS's location to be read on a computer. Further, the device could transmit signals as frequently as every 15 seconds; the maximum length of time between signals was 15 minutes. Shufelt testified that the officers also set up a geofence, which was "like an imaginary fence," for the area surrounding defendant's apartment. Shufelt testified that anytime the GPS tracker left the geofenced area, he would receive notice on his cell phone.

¶ 7    Shufelt testified that, "relatively shortly" after placing the GPS tracker on Powell's vehicle, he received information that a gas station in Aurora had been robbed at approximately 4:40 a.m. Shufelt testified that he checked the GPS and noticed that Powell's vehicle had left the geofenced area at approximately 4:04 a.m., became stationary a few minutes later in the vicinity of the gas station, and reentered the geofenced area at approximately 4:42 a.m. Shufelt testified that, based on this information, defendant became a suspect. Shufelt testified that he did not obtain a warrant to place the GPS device on Powell's vehicle. During cross-examination, Shufelt admitted that Powell had indicated to him that defendant would sometimes drive her car and that she would also give him rides if requested.

¶ 8    The trial court denied defendant's motion to suppress, finding that using the GPS device did not constitute a search under the fourth amendment to the United States Constitution or under the Illinois Constitution. The trial court concluded that defendant "had no expectation of privacy as to where the Kia was or where it went or to, where it went on the public street or to a publically accessible location." The trial court further concluded that, "even if this was a search," defendant did not have standing to challenge the police use of the GPS device on the vehicle.

¶ 9    On December 2, 2009, defendant informed the trial court that he wished to discharge his

attorney and proceed *pro se*. The following colloquy then took place:

"THE COURT: Okay. Now, you know what you are charged with in this case.

THE DEFENDANT: Yes, aggravated robbery I believe it is.

THE COURT: Okay. And I think we've gone over the minimum and maximum sentence. You recall what that is?

THE DEFENDANT: Um, I can't remember. I think the minimum was 4–4 years and the maximum was 15, something like that.

THE COURT: That is correct.

THE DEFENDANT: 4 to 15.

THE COURT: Was the State claiming any nonprobationable status?

MR. PARTIDA [assistant State's Attorney]: Only on the–oh, yes, on all–nonprobationable status as to all counts.

THE COURT: Okay. And enhanced penalty?

MR. PARTIDA: In regard to enhanced penalties, only claiming them on the Class 2s. I'm trying to remember which counts those are.

THE COURT: Counts 2, 3 are the class 2s.

MR. PARTIDA: Just on those two.

THE COURT: So the aggravated robbery was the 4 to 15, Mr. LeFlore.

THE DEFENDANT: Yes. The other was ...

THE COURT: Two years mandatory supervised release, fines of up to 25,000, nonprobationable. The robbery and the burglary, Counts 2 and 3–

THE DEFENDANT: Class 2s.

THE COURT: –are 3 to 7 years Department of Corrections, 2 years mandatory supervised release, fines of up to 25,000. Also, the State has elected–has alleged that by reason of your past record or history that you may be extended-term eligible which means if convicted and the background proof shows up as the State says it is in the proof, then that could become instead of 3 to 7, it could be 3 to 14 years Department of Corrections with a nonprobationable category on both of those as well.

I want to make sure you understand that you do have the right to an attorney, and we have covered that because we have appointed the public defender so you are aware of that, right?

THE DEFENDANT: Yes."

The court had extensive further discussion with defendant and continued the case for a week for defendant to think about his request. On December 9, the trial court discharged the public defender at defendant's request. The case proceeded to a jury trial on January 4, 2010, after which defendant was found guilty of all counts.

¶ 10      At the sentencing hearing, the State submitted certified copies of convictions such that defendant would be subject to mandatory Class X sentencing (6 to 30 years in prison) (see 730 ILCS 5/5-4.5-25 (West 2008)) on the aggravated robbery charge, pursuant to section 5-

-4-

4.5-95(b) of the Unified Code of Corrections (730 ILCS 5/5-4.5-95(b) (West 2010) (eff. July 1, 2009) (formerly 730 ILCS 5/5-5-3(c)(8) (West 2008))). The trial court ultimately sentenced defendant to 20 years in the Department of Corrections on the aggravated robbery charge. Defendant timely appealed.

¶ 11                                  II. DISCUSSION

¶ 12                           A. Motion to Quash and Suppress

¶ 13    We first address defendant's contention that tracking his movements by placing a GPS device on Powell's car violated defendant's constitutional right to be free from unreasonable searches and seizures. While the question of whether the government's placing of a GPS device on a vehicle to monitor the vehicle's movements is a search within the meaning of the fourth amendment has recently been answered in the affirmative by the United States Supreme Court in *United States v. Jones*, 565 U.S. ___, ___, 132 S. Ct. 945, 949 (2012), the question in this case–whether a defendant may claim the fourth amendment's protections for such a search conducted while the defendant is borrowing someone else's car–remains unsettled.

¶ 14    The fourth amendment to the United States Constitution guarantees the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures; this protection applies to the states through the due process clause of the fourteenth amendment. *People v. Wilson*, 228 Ill. 2d 35, 40 (2008). In general, the fourth amendment requires the government to possess a warrant supported by probable cause for a search to be considered reasonable. *Id.* However, to claim the fourth amendment's protections, a person must have a legitimate expectation of privacy in the place searched. *People v. Johnson*, 237 Ill. 2d 81, 90 (2010). Such an expectation of privacy is defined to be one "that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized or permitted by society." (Internal quotation marks omitted.) *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). The person challenging a search bears the burden of establishing that he had a legitimate expectation of privacy in the searched property. *Johnson*, 237 Ill. 2d at 90. Factors to be considered in determining whether a legitimate expectation of privacy exists include the individual's: (1) ownership or possessory interest in the property; (2) prior use of the property; (3) ability to control or exclude others' use of the property; and (4) subjective expectation of privacy. *Johnson*, 237 Ill. 2d at 90. In reviewing a decision on a motion to quash and suppress, we may reverse the trial court's findings of historical fact only if they are against the manifest weight of the evidence. *People v. Humphrey*, 361 Ill. App. 3d 947, 949 (2005). However, we review *de novo* the trial court's ultimate conclusion. *Id.*

¶ 15    In *Jones*, the defendant came under suspicion for trafficking narcotics and became the target of an investigation. *Jones*, 565 U.S. at ___, 132 S. Ct. at 948. Thereafter, and without a warrant, federal agents installed a GPS device on the undercarriage of a Jeep Grand Cherokee while it was parked in a public parking lot, and used the device to track the vehicle's movement over the course of the next 28 days. *Id.* at ___, 132 S. Ct. at 948. The Jeep was registered to Jones's wife, but Jones was the exclusive driver. *Id.* at ___ n.2, 132

S. Ct. at 949 n.2. The government ultimately obtained an indictment charging Jones with intent to deliver cocaine, and Jones moved to suppress the evidence obtained through the GPS device. *Id.* at ___, 132 S. Ct. at 948. The district court denied the motion and a jury ultimately convicted Jones of conspiracy, but the United States Court of Appeals for the District of Columbia Circuit reversed the conviction on the basis that the evidence admitted by warrantless use of the GPS device violated the fourth amendment. *Id.* at ___, 132 S. Ct. at 948-49.

¶ 16     Affirming the court of appeals' reversal, Justice Scalia, writing for the majority, emphasized the property rights-trespass aspect of fourth amendment analysis:

"It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." *Id.* at ___, 132 S. Ct. at 949.

The *Jones* Court also noted:

"[W]e do not make trespass the exclusive test. Situations involving merely the transmission of electronic signals without trespass would *remain* subject to the *Katz* [reasonable expectation of privacy] analysis." (Emphasis in original.) *Id.* at ___, 132 S. Ct. at 953.

Thus, because *Jones* did not make the possessory-interest test the exclusive test, both the possessory-interest and expectation-of-privacy elements considered above in *Johnson* are still relevant to this analysis.

¶ 17     With respect to standing, the *Jones* Court emphasized that, although the Jeep was registered to Jones's wife, the government conceded that Jones was the exclusive driver. *Id.* at ___ n.2, 132 S. Ct. at 949 n.2. Thus, the *Jones* Court noted that, "[i]f Jones was not the owner he had at least the property rights of a bailee." *Id.* at ___ n.2, 132 S. Ct. at 949 n.2. However, because the government did not challenge the court of appeals' conclusion that the Jeep's registration did not affect Jones's ability to make a fourth amendment objection, the *Jones* Court did not consider the fourth amendment significance of Jones's status. *Id.* at ___ n.2, 132 S. Ct. at 949 n.2.

¶ 18     Since *Jones*, other courts have addressed issues similar to the one presented here, *i.e.*, whether, pursuant to *Jones*'s holding on the property-rights aspect of the fourth amendment, a person can claim the fourth amendment's protections for a search conducted while he was borrowing another person's car. In *United States v. Batista*, No. 5:cr11, 2013 U.S. Dist. LEXIS 28710 (W.D. Va. Feb. 28, 2013), the defendant, Albert Batista, was charged with conspiring to distribute heroin. *Id.* at *2-3. During the course of the investigation, law enforcement agents learned that Albert and his brother, Alex, were using their vehicles to drive between Pennsylvania and Virginia. *Id.* at *3. Albert primarily drove a Celica and Alex primarily drove an Intrepid; the Intrepid was registered to their mother and shared by both brothers. *Id.* at *3, *7. Acting on that information, law enforcement agents placed a GPS tracking device on each of the vehicles. *Id.* Subsequently, a confidential informant notified law enforcement agents that the brothers would be traveling to Philadelphia, and the GPS indicated that Alex's Intrepid was driving west from Philadelphia. *Id.* at *3-4. Law

enforcement agents pulled over the Intrepid while Alex was driving and Albert was riding as a passenger. *Id.* at *4. A subsequent search revealed more than 80 bundles of heroin located on the passenger side, stuffed underneath the dashboard near the glove box. *Id.*

¶ 19    Citing *Jones*, Albert contended that the warrantless placement of the GPS on the Intrepid constituted a search under the fourth amendment and that as a result, the exclusionary rule should bar all evidence derived from the GPS tracking. *Id.* at *5. The government countered that Albert lacked standing, arguing that he did not have a reasonable expectation of privacy because he was not the primary driver of the Intrepid, he was merely a passenger in the vehicle at the time of the stop, and he was not in "possession" of the vehicle when law enforcement installed the GPS. *Id.* at *6-7.

¶ 20    The court in *Batista* phrased the issue as whether Albert "ha[d] standing to challenge both the placement of the GPS tracking device as well as its use." *Id.* at *12. With respect to placement, the court concluded that Albert had a reasonable expectation of privacy when the GPS was placed on the Intrepid, because Albert was in possession of that vehicle at the time. *Id.* The court noted that the government could establish that Alex, the purported primary driver of the Intrepid, drove that vehicle only five times, and therefore it was reasonable to infer that Albert also drove the Intrepid "from the fact that the Intrepid was parked at [Albert's] apartment late at night when the GPS was installed." *Id.* at *13. The court further emphasized that the fact that the Intrepid was parked at Albert's apartment complex showed that Albert had a possessory interest. *Id.* at *13-14. The court rejected the government's argument that Alex could have merely been visiting Albert when the device was installed, noting that a GPS device was placed on the Celica that same night, and at a poultry plant where Alex worked. Thus, the court concluded that "[a]lthough the issue is a close one, it is reasonable to conclude that at the time of the placement of the GPS tracking device, [Albert] was in possession of the Intrepid." *Id.* at *14.

¶ 21    Turning to whether Albert had standing to challenge the use of the GPS device, the court noted that the issue "likewise is close." *Id.* The court noted that the government believed that Albert and Alex traveled together to purchase heroin and transport it back to Virginia and that "[i]t [was] with this knowledge of the joint use of the Intrepid by the *** brothers that the government agents placed the GPS tracking device on both the Intrepid and the Celica." *Id.* at *14-15. Thus, considering the evidence in its totality, the court concluded that Albert had standing to challenge both the placement and the use of the GPS. *Id.* at *15.

¶ 22    Also following *Jones*, in *United States v. Gibson*, 708 F.3d 1256 (11th Cir. 2013), the United States Court of Appeals for the Eleventh Circuit considered whether the borrower of a vehicle, who had possession of the vehicle when a GPS tracking device was installed but not when the vehicle was searched, had standing under the fourth amendment to challenge the search. See *id.* at 1277. In *Gibson*, federal agents decided to install the tracking device on a Chevrolet Avalanche, which was registered to Kelvin Burton, after seeing the defendant, James Gibson, driving the Avalanche and after observing the Avalanche parked at Gibson's home. *Id.* at 1261-62. Assisted by the tracking device, law enforcement pulled over the Avalanche while Burton was driving. *Id.* at 1262-63. After being indicted for conspiracy to distribute and possess cocaine (*id.* at 1260), Gibson moved to suppress evidence seized based on the warrantless installation of the device (*id.* at 1263). The government countered that

Gibson lacked standing because he was not the registered owner, the driver, or a passenger of the vehicle when law enforcement stopped and searched it. *Id.*

¶ 23    In addressing this issue, the reviewing court in *Gibson* first noted that, although Gibson did not own the vehicle, he paid for its maintenance and insurance and also frequently drove it. *Id.* at 1276-77. The reviewing court noted, "[w]e have held that an individual who borrows a vehicle with the owner's consent has a legitimate expectation of privacy in the vehicle and standing to challenge its search while it is in his possession." *Id.* at 1277 (citing *United States v. Miller*, 821 F.2d 546, 548 n.2 (11th Cir. 1987)). The reviewing court further cited *United States v. Hernandez*, 647 F.3d 216 (5th Cir. 2011). There, a federal agent attached a GPS device to a truck owned by Angel Hernandez while the truck was parked on a public street in front of Angel's house. *Id.* at 218. Two days later, agents used the device to locate the vehicle and observed Angel's brother, Jose, load several packages onto the truck. *Id.* The agents alerted local authorities, who stopped Jose for a traffic violation, obtained consent to search the truck, and discovered illegal narcotics. *Id.* The Fifth Circuit concluded that Jose lacked standing to challenge the installation of the GPS device, in part because he did not have a possessory interest in Angel's truck when the device was installed. *Id.* at 219. However, the court in *Hernandez* concluded that "where a person has borrowed an automobile from another, with the other's consent, the borrower becomes a lawful possessor of the vehicle and thus has standing to challenge its search." (Internal quotation marks omitted.) *Id.* at 220.

¶ 24    The reviewing court in *Gibson* noted that Gibson's position was the opposite of that in *Hernandez*, *i.e.*, that Gibson was a borrower of a vehicle when the tracking device was installed, but not when the vehicle was searched and the drugs were found. *Gibson*, 708 F.3d at 1277. Thus, the reviewing court concluded that Gibson had standing to challenge the installation and use of the tracking device while the vehicle was in his possession, but "not the use of the tracking device to locate the Avalanche when it was moving on public roads and [Gibson] *was neither the driver nor a passenger*." (Emphasis added.) *Id.* Because Gibson had no possessory interests in the Avalanche on February 20, 2009, he lacked standing to challenge the search of the vehicle. *Id.*

¶ 25    Pursuant to *Jones* and its progeny, the common denominator of law appears to be that, under the *Jones* trespass test, a person who borrows a vehicle with the owner's consent comes into lawful possession of that vehicle and has standing to challenge a search under the fourth amendment. Thus, if the defendant borrows a vehicle with the owner's consent and is in lawful possession of the vehicle when the GPS device is installed, the defendant has standing under *Jones* to challenge the installation. See *Batista*, 2013 U.S. Dist. LEXIS 28710, at *14. Further, if the defendant is not in possession of the vehicle when the GPS device is installed, but he later comes into lawful possession by borrowing the vehicle with the owner's consent and while the government's trespassory *act* remains in place, the defendant has standing to challenge the *use* of the GPS device. See *Hernandez*, 647 F.3d at 219.

¶ 26    The essence of the *Jones* trespass test is whether the government physically occupies private property for the purpose of obtaining information. *Jones*, 565 U.S. at ___, 132 S. Ct. at 949. In this case, the State's trespass on Powell's vehicle would not have ended when

defendant came into lawful possession by borrowing the vehicle with consent. Instead, the State's continued, and conceivably neverending, use of the GPS device to monitor the vehicle constituted a continuing trespass. See Black's Law Dictionary 1541 (8th ed. 2004) (defining "continuing trespass" as "[a] trespass in the nature of a permanent invasion of another's rights, such as a sign that overhangs another's property"). Therefore, we conclude that, if defendant came into lawful possession of the vehicle by borrowing it with Powell's consent, and while the State's trespass remained ongoing, his standing to challenge the use of the GPS device would come within the ambit of *Jones*.

¶ 27   We recognize the holding in *United States v, Barraza-Maldonado*, 879 F. Supp. 2d 1022 (D. Minn. 2012). In that case, the defendant moved to suppress evidence obtained as a result of law enforcement's warrantless installation of a GPS device on a vehicle that the defendant drove from Arizona to Minnesota. *Id.* at 1024. In denying the defendant's motion, the district court focused on the *Jones* majority's discussion of two "beeper" cases, *United States v. Knotts*, 460 U.S. 276 (1983), and *United States v. Karo*, 468 U.S. 705 (1984). In *Knotts*, the Supreme Court held that the use of a beeper that had been placed–with the owner's consent–in a container of chloroform, allowing law enforcement to monitor the location of the container, did not violate the fourth amendment. *Knotts*, 460 U.S. at 278. In *Karo*, the Supreme Court held that the installation of a beeper, also with the consent of the original owner, did not constitute a search or seizure under the fourth amendment. *Karo*, 468 U.S. at 712. Distinguishing *Karo*, the *Jones* majority noted:

> "Karo accepted the container as it came to him, beeper and all, and was therefore not entitled to object to the beeper's presence, even though it was used to monitor the container's location." *Jones*, 565 U.S. at ___, 132 S. Ct. at 952.

The district court in *Barraza-Maldonado*, while acknowledging that the GPS device was installed on the vehicle *without* the owner's consent (unlike in *Knotts* and *Karo*), concluded that the defendant " 'accepted the [vehicle] as it came to him, [GPS device] and all, and [is] therefore not entitled to object to the [GPS device's presence], even though it was used to monitor the [vehicle's] location.' " *Barraza-Maldonado*, 879 F. Supp. 2d at 1028 (quoting *Jones*, 565 U.S. at ___, 132 S. Ct. at 952). Thus, the court summarized the *Jones* trespass test:

> "When the government installs a GPS device (or similar device) in a piece of property before the defendant has any legal interest in the property, the installation of the device is not a trespass on the property of the defendant and is therefore not a search of the defendant for the purposes of the trespassory test. *** Moreover, when a defendant takes possession of a piece of property on which a GPS device has already been installed, the continued monitoring of that device is also not a trespass on the property of the defendant, and therefore is not a search of the defendant for the purposes of the trespassory test." *Id.* at 1027-28.

¶ 28   With due respect, contrary to the district court in *Barraza-Maldonado*, our reading of *Jones* reflects that the Supreme Court merely rejected the government's reliance on *Knotts* and *Karo* by noting that neither of those cases involved a trespass. As a result, the defendants in *Knotts* and *Karo* could not have invoked the *Jones* trespass test to challenge the searches.

In other words, we do not believe that, by distinguishing *Knotts* and *Karo*, the *Jones* Court intended to preclude a defendant who borrows a vehicle with the owner's consent from challenging the government's *use* of a GPS device while the defendant is in lawful possession, even if the defendant was not in possession of the vehicle when the government *installed* the GPS device. See *Hernandez*, 647 F.3d at 219.

¶ 29    In sum, this case involved the State's continuing trespass on Powell's vehicle. We believe that, if defendant borrowed the vehicle with Powell's consent, he would have standing under *Jones* to challenge the State's use of the GPS device, and any evidence obtained from that use, despite not being in possession of the vehicle when the GPS device was installed. Accordingly, we vacate the trial court's order denying defendant's motion to quash and suppress and we remand to the trial court for further proceedings on this issue. On remand, both defendant and the State will have the opportunity to develop their arguments with respect to their relative positions and, after a full hearing, the trial court will be better able to determine whether defendant's motion to quash and suppress comes within the ambit of the *Jones* trespass test.

¶ 30    The dissent argues that *Jones* "did not in any way change the requirement that in order to challenge a search, a defendant must demonstrate his own legitimate expectation of privacy in the place searched." *Infra* ¶ 88. We have not held that, after *Jones*, a defendant no longer needs to demonstrate his expectation of privacy in the place searched. The most logical reading of *Gibson* is that, because a person has standing to challenge the installation of a GPS device if he was in possession of the vehicle when the GPS device was installed (*Gibson*, 708 F.3d at 1277), being in possession of the vehicle gave him a reasonable expectation of privacy. Finding the reasoning in *Gibson* persuasive, we are merely concluding that, *if* defendant was in lawful possession of Powell's vehicle when the GPS device was installed, he would have standing to challenge the installation of the GPS device. Likewise, pursuant to *Gibson*, if defendant was in lawful possession of the vehicle when the GPS device was used, he would have standing to challenge the use of the GPS device. *Id.* Thus, although *Jones* did not change the requirement that under the fourth amendment a defendant must demonstrate a reasonable expectation of privacy in the place searched, there can be no doubt that fourth amendment jurisprudence has evolved since *Jones*.

¶ 31    The dissent also claims that there is no need to look to federal case law, because decisions from our supreme court "guide us in determining whether a defendant has established a legitimate expectation of privacy in the place searched or the property seized." *Infra* ¶ 89. We are aware of no decisions from our supreme court addressing a defendant's standing under the fourth amendment to challenge the warrantless installation and use of a GPS device on a borrowed vehicle.

¶ 32    We recognize that, as the dissent notes, defendant was an unlicensed driver. Citing *People v. McCoy*, 269 Ill. App. 3d 587 (1995), *People v. Bower*, 291 Ill. App. 3d 1077 (1997), and *United States v. Haywood*, 324 F.3d 514 (7th Cir. 2003), the dissent concludes that "[a]s a revoked driver, defendant clearly had no legitimate expectation of privacy in Powell's vehicle or its movements." *Infra* ¶ 98.

¶ 33    Contrary to the dissent's conclusion, defendant's status as an unlicensed driver does not

necessarily defeat his expectation of privacy in Powell's vehicle. In *McCoy*, the court held that a driver and a passenger of a rented vehicle, both of whom were not licensed drivers, did not have standing to challenge law enforcement's search of the rented vehicle. The court concluded that the passenger, McCoy, could not have had a valid interest in the vehicle because, as an unlicensed driver, he could not have rented it. *McCoy*, 269 Ill. App. 3d at 592-93. The court noted in *dicta* that, even if McCoy obtained the vehicle from " 'kinfolk,' " it was "doubtful" that they could have legitimately entrusted the vehicle to McCoy as an unlicensed driver. *Id.* at 593.

¶ 34    We do not find the holding in *McCoy* dispositive on the issue presented here. As the special concurrence in *McCoy* opined:

> "If someone leases a vehicle from a leasing company, then loans that vehicle to one of his relatives for a trip from Chicago to Rantoul, I would conclude the relative has a possessory interest in the vehicle sufficient to afford standing for a motion to suppress. The fact the relative is not licensed to drive might be relevant on the issue [of] whether the lessee actually loaned out the vehicle, but is not relevant on the relative's possessory interest. It is possible for an unlicensed driver to possess a motor vehicle, just as it is possible for an unlicensed driver to own a motor vehicle. *Even where a vehicle is operated illegally the operator may have a possessory interest in the vehicle*." (Emphasis added.) *Id.* (Cook, J., specially concurring).

¶ 35    *Bower* also provides little guidance. The issue in that case was whether a defendant in sole possession and control of a rental car entrusted to him by the renter, but without the consent of the rental company, had standing to challenge a search of the car. *Bower*, 291 Ill. App. 3d at 1080. The court concluded that, under the express terms of the rental agreement, the person who rented the vehicle was the only legal operator of the rental car. *Id.* Simply stated, the present case does not involve the question of whether a rental agreement contractually permitted defendant to drive Powell's vehicle.

¶ 36    Moreover, we recognize that the court in *Haywood* concluded that an unauthorized driver did not have a reasonable expectation of privacy in a rental car because "[the rental company] never would have given [the defendant] permission to drive." *Haywood*, 324 F.3d at 516. However, other federal cases have taken the opposite view. In *United States v. Best*, 135 F.3d 1223 (8th Cir. 1998), the defendant, who had a suspended license, was driving from Texas to Washington, D.C., in a car rented by his friend. *Id.* at 1224. A law enforcement officer initiated a traffic stop in Arkansas, searched the vehicle, and found 19 bundles of marijuana. *Id.* The reviewing court remanded the matter for the trial court to make a factual finding with respect to whether the defendant had standing to challenge the search. *Id.* at 1225. In doing so, the reviewing court noted that, although the defendant did not have a valid license, "[i]f [the defendant's friend] had granted [the defendant] permission to use the automobile, [the defendant] would have a privacy interest giving rise to standing." *Id.*

¶ 37    Based on the foregoing, we disagree with the dissent's position that defendant's status as a revoked driver necessarily defeated any legitimate expectation of privacy that he could have had in Powell's vehicle. Rather, in light of the unresolved case law in both Illinois and federal courts, we believe that the law will be better served by considering defendant's status

-11-

as a revoked driver after the parties provide a more complete record on remand.

¶ 38    The dissent further claims that the use of the GPS device was consistent with the principles set forth in *People v. Wilson*, 228 Ill. 2d 35 (2008), in which our supreme court held that a parolee–which defendant here was when the GPS device was installed and used–enjoys a greatly diminished expectation of privacy and is subject to warrantless searches. *Id.* at 41-42. The dissent emphasizes that, as a condition of his release, defendant here signed a written explanation of his "parole or mandatory supervised release." *Infra* ¶ 100. That agreement, titled "Parole or Mandatory Supervised Release Agreement," specified that defendant was under the legal custody of the Department of Corrections and that defendant "shall" consent to a search of his person, property, or residence. The dissent maintains that applying *Wilson* here is consistent with the principle that " 'a State's interest in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment.' " *Id.* at 50-51 (quoting *Samson v. California*, 547 U.S. 843, 853 (2006)).

¶ 39    While we recognize the principles put forth in *Wilson* and recognize that parolees have a diminished expectation of privacy, they still enjoy some fourth amendment protections. *Samson*, 547 U.S. at 850 n.2 ("Nor *** do we equate parolees with prisoners for the purpose of concluding that parolees, like prisoners, have no [f]ourth [a]mendment rights."). As the *Wilson* court noted, although parolees are subject to warrantless searches, the searches must be reasonable. *Wilson*, 228 Ill. 2d at 40. "In determining the reasonableness of a warrantless search, a court must examine the totality of the circumstances and assess, on the one hand, the degree to which the search intrudes upon an individual's privacy and, on the other [hand], the degree to which it is needed for the promotion of legitimate governmental interests." *Id.*

¶ 40    Unlike the defendant in *Wilson*, whose bedroom was subject to a one-time warrantless search while he was on parole (see *id.* at 38-39), defendant and Powell here were subjected to continuous, surreptitious, and potentially indefinite GPS monitoring. In her concurring opinion from *Jones*, Justice Sotomayor noted that even short-term GPS surveillance generates "a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Jones*, 565 U.S. at ___, 132 S. Ct. at 955 (Sotomayor, J., concurring). Because GPS monitoring is inexpensive compared to traditional surveillance techniques, and is also surreptitious, it evades the normal checks aimed to constrain abusive law enforcement practices. *Id.* at ___, 132 S. Ct. at 956 (Sotomayor, J., concurring). Thus, Justice Sotomayor concluded:

"Awareness that the Government may be watching chills associational and expressive freedoms. And the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse. ***

I would take these attributes of GPS monitoring into account when considering the existence of a reasonable societal expectation of privacy in the sum of one's public movements. I would ask whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the Government to ascertain, more or

less at will, their political and religious beliefs, sexual habits, and so on." *Id.* at ___, 132 S. Ct. at 956 (Sotomayor, J., concurring).

¶ 41    Justice Sotomayor's concerns are exemplified in this case. Shufelt testified that the GPS device was set to transmit signals every 15 minutes, but could have transmitted signals as frequently as every 15 seconds. In addition, law enforcement officials set up a geofence–"like an imaginary fence," according to Shufelt–for the area surrounding defendant's apartment. Anytime the GPS device left that area, Shufelt would be notified.

¶ 42    Defendant's required consent to searches of his person, property, or residence did not include being subjected to continuous and unfettered surveillance of his movements. As part of his parole agreement, defendant agreed to be subject to electronic monitoring for 90 days beginning December 29, 2007. As the dissent notes, the Prisoner Review Board imposed this requirement. If that Board wanted to extend defendant's electronic monitoring beyond 90 days, it could have sought defendant's consent to do so. Thus, we believe that, once the 90-day electronic monitoring period expired, defendant had an expectation that, although he continued to be required to submit to searches of his person, property, or residence upon demand, he would not be surreptitiously monitored to the extent that law enforcement officials would be notified every time a vehicle he was associated with went outside of an "imaginary fence." That a defendant could be subjected to such continuous and invasive surveillance would render any fourth amendment protections meaningless. See *Samson*, 547 U.S. at 850 n.2 (noting that parolees are not equated with prisoners with respect to the fourth amendment, with the latter having no fourth amendment protections).

¶ 43    Finally, citing *Davis v. United States*, 564 U.S. ___, 131 S. Ct. 2419 (2011), the dissent maintains that the good-faith exception to the exclusionary rule should be invoked and that the GPS tracking evidence need not be suppressed. In *Davis*, the Supreme Court held that evidence should not be excluded when law enforcement obtained the evidence during a search conducted in reasonable reliance on *binding precedent*. *Id.* at ___, 131 S. Ct. at 2429.

¶ 44    Nonetheless, we are not persuaded by the dissent's position that the good-faith exception should be invoked in this case. The dissent notes that, on April 23, 2009, there were no reported decisions from Illinois reviewing courts addressing whether the use of a GPS device without a warrant violated the fourth amendment. *Infra* ¶ 112. The dissent further notes that the majority of other state courts and federal courts had found that GPS devices were the next generation of tracking technology to evolve from beepers, which were addressed in *Knotts* and *Karo*, and therefore their use did not constitute a search within the meaning of the fourth amendment. *Infra* ¶ 112.

¶ 45    We are not convinced. The good-faith exception articulated in *Davis* applies when law enforcement relies on binding precedent. *United States v. Lee*, 862 F. Supp. 2d 560, 569 (E.D. Ky. 2012). As Justice Sotomayor noted in her concurrence in *Davis*, that case did not "present the markedly different question [of] whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." *Davis*, 564 U.S. at ___, 131 S. Ct. at 2435 (Sotomayor, J., concurring). When a law enforcement official conducts a search based on a nonbinding judicial decision, that official is "guessing at what the law might be, rather than relying on what a binding legal authority tells him it is." *Lee*,

862 F. Supp. 2d at 569 (defining a nonbinding judicial decision as an opinion by a trial court, an unpublished opinion by its reviewing court, or a published opinion from another reviewing court). Here, as the dissent acknowledges, there were no reported decisions in Illinois addressing whether the warrantless use of a GPS device violated the fourth amendment. At best, that question remained unsettled on April 23, 2009.

¶ 46 Moreover, while we recognize that the United States Court of Appeals for the Seventh Circuit held in *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007), that the installation and use of a GPS device without a warrant did not violate the fourth amendment, we do not find the circumstances there to be analogous to the search at issue here. In *Garcia*, law enforcement officers placed a GPS "memory tracking unit" underneath the defendant's car without a warrant. *Id.* at 995. That device received and stored satellite signals that indicated the device's location, "[s]o when the police later retrieved the device *** they were able to learn the car's travel history since the installation of the device." *Id.* Relying in part on *Knotts* and *Karo*, *i.e.*, the "beeper" cases, the Seventh Circuit concluded that using a GPS device was not a search within the meaning of the fourth amendment. *Id.* at 996-97.

¶ 47 In this case, the type of GPS tracking device used was significantly more invasive than the device used in *Garcia*. There, the "memory tracking unit" had to be retrieved before the police could access the information, which consisted of the defendant's *previous* travel movements. Here, as noted above, Shufelt was able to learn not merely the vehicle's previous travel history once he retrieved the GPS tracking device. Rather, Shufelt used a GPS device that was capable of transmitting contemporaneous signals as frequently as every 15 seconds. Shufelt also created a "geofence" around defendant's apartment, and he would be notified whenever the GPS device went outside the geofenced area. Unlike *Garcia*, the type of surveillance here involved continuous surveillance and transmission that Shufelt could *instantaneously* access, without having to retrieve the GPS device. In addition, the device automatically notified Shufelt when the vehicle went outside of a specific area. Therefore, Shufelt was able to access information on the vehicle's *contemporaneous* movements, not just prior movements as in *Garcia*.

¶ 48 We are aware of no binding authority existing on April 23, 2009, that Shufelt could have relied on to conclude that such a search would not violate the fourth amendment. At best, Shufelt could have only speculated that *Garcia*, which involved using a GPS device to monitor a defendant's previous movements after the GPS device had been retrieved, provided binding authority to conduct a warrantless search using a GPS device that provided constant and contemporaneous information on a vehicle with which defendant was associated.

¶ 49 B. Illinois Supreme Court Rule 401(a)

¶ 50 Defendant next contends that the trial court failed to comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) when defendant waived his right to counsel. Defendant argues that the trial court failed to properly admonish him about the maximum sentence that he faced. Clearly, the trial court admonished defendant that the maximum sentence that he faced for the aggravated robbery charge was 15 years. Aggravated robbery is a Class 1 felony,

punishable by a term of imprisonment of 4 to 15 years. See 720 ILCS 5/18-5(b) (West 2008); 730 ILCS 5/5-4.5-30(a) (West 2008). The court made this admonishment after being told by the State that it would potentially seek enhanced penalties on only the robbery and burglary charges.

¶ 51    The State counters that defendant forfeited this contention, as he "did not raise it below." However, at the sentencing hearing, when told by the State that defendant was subject to mandatory Class X sentencing on the aggravated robbery charge, defense counsel, who had been appointed after the trial, argued:

> "I don't think that there's anything in the file or oral record that would indicate that Mr. LeFlore was ever admonished that he was Class X sentencing eligible, so I believe out of fairness of due process, that Mr. LeFlore should have been admonished of this so he would have full knowledge going to the 402 conference deciding to represent himself before trial then actually representing himself at trial that he was facing six to 30 years, rather than the four to 30 [*sic*] years ***."

The lack of a proper admonishment was clearly raised. The State is correct that defendant failed to raise the issue in his motion to reconsider his sentence, and to be properly preserved for review an issue must be raised both contemporaneously and in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, plain-error review is appropriate where the alleged error concerns the deprivation of a fundamental right. *People v. Ogurek*, 356 Ill. App. 3d 429, 433 (2005). Because the right to counsel is a fundamental right (*id.*), we will consider the merits of defendant's argument.

¶ 52    Rule 401(a) provides that, before a court may permit a waiver of counsel by a person accused of an offense punishable by imprisonment, the court must, among other things, inform the defendant of, and determine that he understands, "the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences." Ill. S. Ct. R. 401(a)(2) (eff. July 1, 1984). The purpose of this rule is to ensure that a defendant knowingly and intelligently makes a waiver of counsel. *People v. Campbell*, 224 Ill. 2d 80, 84 (2006). Substantial compliance with the rule is required for an effective waiver of counsel. *Id.* The difference between "strict compliance" and "substantial compliance" has been described as "essentially superficial." *People v. Gilkey*, 263 Ill. App. 3d 706, 711 (1994). What must be shown is:

> "any deficiency in the admonishments must not prejudice the defendant, either because he was already aware of the information that was omitted or because his degree of legal sophistication made it evident that he was aware of the information that compliance with the rule would have conveyed. In other words, *** the dispositive issue to be determined when deciding whether a waiver of counsel *** is valid is whether the waiver of counsel was knowingly, understandingly and effectively made, in light of the entire record." *Id.*

¶ 53    Clearly, the trial court failed to properly admonish defendant regarding the minimum and maximum sentences that he could receive if convicted of aggravated robbery. Defendant was admonished twice by the court that he could be sentenced to between 4 and 15 years in prison if convicted of that charge, the most serious charge that he faced. In fact, he could have been

sentenced to between 6 and 30 years because of his prior convictions, and he was actually sentenced to 20 years. This court has found that admonishing a defendant regarding the possible penalties for the most serious crime with which he is charged is "especially important" where, because of prior convictions, a defendant is facing mandatory Class X sentencing. See *People v. Jiles*, 364 Ill. App. 3d 320, 330 (2006). Defendant here was facing just such mandatory sentencing on his aggravated robbery conviction. We fail to see compliance of any sort in the trial court's relaying to defendant incorrect information about the minimum and maximum penalties he faced.

¶ 54    The State posits that "the extent of defendant's criminal history was apparently unknown and the court mistakenly admonished defendant" that he faced a sentence of 4 to 15 years. However, the State apparently was aware of a sufficient portion of defendant's criminal history, both at the arraignment in May 2009 and in December 2009 (one month before trial), when defendant sought to dismiss his attorney, to inform the court that it was seeking enhanced sentencing on the robbery and burglary charges but not on the aggravated robbery charge. While the court's admonishment was incorrect, it was based, at least in part, on the State's assertion that it was not "claiming" any enhanced penalty on the charge and its failure to inform the court about the possibility of mandatory Class X sentencing.

¶ 55    The State also argues that there was substantial compliance with Rule 401(a) because defendant was later told that he was eligible for Class X sentencing. At a pretrial conference held on December 31, 2009, defendant and the State held an off-the-record discussion. When they returned, the assistant State's Attorney informed the court that he and his co-counsel:

> "briefly discussed what the pending offer was with Mr. LeFlore. We discussed what we believed that the appropriate sentencing range was. We mainly informed him that we believed that he was Class X, even on a 2; and one he's mandatory X based on a prior history ***."

¶ 56    Again, we see no compliance from this alleged discussion. A defendant must be admonished pursuant to Rule 401(a) *prior to* waiving the right to counsel. *Ogurek*, 356 Ill. App. 3d at 436. This discussion took place three weeks after the trial court discharged defendant's attorney. It is clear that, at the time of the admonishments, defendant was not aware of the information that was omitted (the sentencing range of 6 to 30 years) and was twice misinformed of the sentencing range. No compliance can be found here.

¶ 57    Further, we cannot conclude that defendant possessed any degree of legal sophistication such that it is evident that he was aware of the sentencing range that compliance with the rule would have conveyed. When defendant informed the trial court that he wished to discharge his attorney and proceed *pro se*, the trial court asked defendant if he had any history, background, or familiarity "with the criminal system regarding particulars of going to trial and issues of evidence in a criminal trial." Defendant answered that he had "somewhat some [*sic*]," but, when asked to what extent, he responded, "Not much." Defendant explained that he had been "through a few trials" and told the court that he "went through *pro se*" on his most recent charge, for attempted burglary. When asked if it was a bench or a jury trial, defendant explained that "[i]t didn't get that far," that he "decided to take the plea" that "was brought to me from the judge herself." He stated that he had brought some pretrial motions

in that case and had done some legal research. That was the one case that defendant could remember that provided him with familiarity with the criminal system.

¶ 58    At oral argument, the State pointed out defendant's extensive criminal history that reached back to the mid-1970s and boasted multiple felony convictions, including one Class X conviction of armed robbery that garnered defendant a sentence of 10 years in prison. However, we are not prepared to ascribe to defendant a heightened level of legal sophistication based on a *pro se* plea agreement and the supposedly osmotic experience of being repeatedly arrested and convicted. A long rap sheet is not the equivalent of a *Juris Doctorate*, and recidivism with punishment infers a perverse level of sophistication.

¶ 59    We cannot conclude that defendant was "aware of the information that was omitted" or that "his degree of legal sophistication made it evident that he was aware of the information that compliance with the rule would have conveyed." *Gilkey*, 263 Ill. App. 3d at 711. Even his prior Class X conviction was more than 21 years in the past and resulted in a sentence less than the maximum Class 1 sentence about which he was twice admonished here. Neither the trial court nor the State appeared to have the knowledge that Class X sentencing was applicable, and we will not hold defendant to a higher level of knowledge. The trial court twice misinformed defendant of the maximum sentence allowed; the maximum allowed was twice as long as the trial court stated, and the actual sentence imposed was 33% longer than that conveyed in the admonishment.

¶ 60    While courts will look to the defendant's *pro se* performance throughout the trial court proceedings for evidence of legal sophistication (see *Jiles*, 364 Ill. App. 3d at 330), the ultimate issue is not whether the defendant can adequately cross-examine witnesses or make a decent closing argument on his own behalf. The issue is whether the defendant has made a knowing, intelligent waiver of his right to an attorney and whether a noncompliant admonishment prejudiced the defendant. The purpose of an admonishment is to inform the defendant concerning matters that have been deemed necessary to make a proper decision; it is not to certify that the defendant already knew of those matters. We are unaware of any admonishment that asks if the defendant previously was aware of certain matters. The admonishment presumes the opposite. Here, the trial court's failure to comply with Rule 401(a) clearly prejudiced defendant and denied him his fundamental right to representation by counsel. Therefore, his convictions must be reversed and the cause remanded for a new trial. On remand, defendant should be given the admonishments required under Rule 401(a) and the opportunity to be represented by an attorney or to make a knowing and intelligent waiver of that right. See *id.* at 330.

¶ 61    Finally, because we are reversing and remanding for a new trial, we must also address the question of whether the evidence admitted at trial was sufficient to prove that defendant was guilty beyond a reasonable doubt. See *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). When we consider all of the evidence presented at trial, we find that the State presented sufficient evidence of defendant's guilt such that remand will not violate defendant's constitutional right against double jeopardy. See *People v. Taylor*, 76 Ill. 2d 289, 309-10 (1979). We emphasize, however, that this determination is not binding on retrial and does not express an opinion concerning defendant's guilt or innocence.

¶ 62                                III. CONCLUSION

¶ 63       For the foregoing reasons, we reverse the judgment of the circuit court of Kane County
and remand the cause.


¶ 64       Reversed and remanded.


¶ 65       JUSTICE BIRKETT, concurring in part and dissenting in part.

¶ 66       I agree with my colleagues that defendant's convictions of aggravated robbery, robbery,
and burglary[1] must be reversed because the trial court did not substantially comply with
Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) and that the "sophisticated
knowledge" exception to the rule does not apply in this case. However, I disagree with my
colleagues that the trial court's ruling on defendant's motion to quash and suppress should
be vacated. In my view, defendant failed completely to establish that he had a legitimate
expectation of privacy in Powell's vehicle, either at the time of the placement of the device
or when it was used to track the vehicle's movements. Further, even if defendant did have
a legitimate expectation of privacy in the vehicle, and he did not, the good-faith exception
to the exclusionary rule applies here so as to support the trial court's denial of defendant's
motion to quash and suppress.


¶ 67                             Illinois Supreme Court Rule 401(a)

¶ 68       Whether the record demonstrates substantial compliance with Illinois Supreme Court
Rule 401(a) (eff. July 1, 1984) is a close question. The record clearly shows that defendant
was made aware by the State that it believed he was eligible for a Class X sentence. On
December 31, 2009, at the State's suggestion, defendant requested an opportunity to discuss
a plea offer with the State. After their discussions, the State made a record, saying "[w]e
mainly informed him that *we believed* that he was Class X, even on a 2 [(Class 2
conviction)]; and one he's mandatory X based on a prior history." (Emphasis added.) The
State indicated that there was no agreement reached and that "Mr. LeFlore wanted to address
some of the trial issues." The trial court simply said "okay" and then took up other matters
concerning trial preparation. During the hearing on defendant's posttrial motion, defendant
testified that before trial he understood from his attorney that the longest sentence he could
expect to get was 10 years and that this is why he decided to represent himself. On cross-
examination, the State established that defendant had discussed a 10-year offer. Defendant
denied that he thought the jury would say "not guilty." He testified that he did not know what
the jury was going to say but that if he lost he "was going to get 10 years." During the
hearing, the trial court asked defendant the following question:

          "THE COURT: Okay. And is there any time in–in court that you remember me
          telling you that you were going to get a 10-year sentence, no matter what happened?

_____

          [1]At sentencing, the trial court merged the robbery and burglary convictions into the
aggravated robbery conviction.

                                          -18-

DEFENDANT: When–no."

¶ 69    There is no doubt that the State should have known defendant was eligible for a Class X sentence long before the December 31, 2009, court date. Defendant's presentence report shows that he has been eligible for a Class X sentence on a Class 2 felony conviction since 1996, when he was sentenced in Cook County to six years in the Illinois Department of Corrections (IDOC) for burglary. See 730 ILCS 5/5-5-3(c)(8) (West 1996) (on a third Class 1 or 2 conviction, a "defendant shall be sentenced as a Class X offender"). Since then, defendant has had five more felony convictions, the longest sentence being nine years for burglary. As my colleagues say, we cannot conclude that defendant was aware of the sentencing range. In ruling on defendant's posttrial motion, the trial court remarked that "it would not be reasonable to believe that it would be a maximum or a limitation on the sentence contrary to the admonishments given." That might be true; however, the admonishment given was 4 to 15 years, not 6 to 30 years.

¶ 70    I likewise agree with my colleagues that the "sophisticated knowledge" exception to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) does not apply in this case. First, the State did not develop this argument in its brief. This issue was raised for the first time at oral argument. In *People v. Jackson*, 59 Ill. App. 3d 1004 (1978), the record established that during plea discussions the State "offered to recommend a one- to three-year sentence for a plea of guilty." *Id.* at 1008. The defendant was dissatisfied with his attorney and, against the trial court's advice, elected to proceed *pro se*. The record did not show that the defendant had not been properly advised of the minimum and maximum sentences. However, the sentence imposed was the same sentence that the State offered in plea discussions, one to three years, and the "entire record" showed that the "defendant knowingly and intelligently waived his right to counsel." *Id.* at 1009. The same cannot be said in this case.

¶ 71                              Motion to Quash and Suppress

¶ 72    I respectfully disagree with my colleagues that there is any basis to vacate or reverse the trial court's ruling on defendant's motion to quash and suppress. We may affirm the trial court's ruling on any basis supported by the record. *Johnson*, 237 Ill. 2d at 89. Where the defendant fails to renew his motion at trial, he may not rely on facts developed at trial to overturn the trial court's ruling on the motion. *People v. Brooks*, 187 Ill. 2d 91, 127-28 (1999).

¶ 73    The evidence at the hearing on the defendant's motion to suppress established that Detective Shufelt obtained permission from Sergeant Wallers to use the GPS device. Shufelt placed the device under the Kia's bumper between 3:30 and 4 a.m. on April 23, 2009. The robbery to the gas station took place at 4:40 a.m. on April 24, 2009.

¶ 74    The extent of the evidence concerning any interest that defendant might have had in the vehicle was Shufelt's testimony that Powell had told him that defendant "would drive the car from time to time" and that she would drive defendant when he "requested a ride" because his license "wasn't valid." The record reflects that defendant's driving privileges were

-19-

revoked.[2] Shufelt also testified that he was familiar with parole conditions and that one of the conditions is that a parolee has to consent to a search of his person, property, or residence by any law enforcement officer. The State then introduced a copy of defendant's signed parole agreement.

¶ 75    At the conclusion of the testimony, defense counsel argued cases that dealt with whether the particular procedures employed by law enforcement constituted a search under the fourth amendment. For example, counsel cited to *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381 (1992), which held that, under the Illinois Constitution, probable cause must be established to obtain head hair and pubic hair from a suspect pursuant to a grand jury subpoena. Counsel also cited to *People v. Caballes*, 221 Ill. 2d 282 (2006), for the proposition that unlike a canine sniff, which does distinguish between lawful and unlawful activities, the use of a GPS device "not only discloses criminal activity, but also lawful activity," and, "therefore, has to pass muster under the fourth amendment." *Id.* at 332. However, counsel did not cite a single case to support the argument that defendant had established a legitimate expectation of privacy in the Kia.[3] Counsel argued merely that defendant had "a reasonable expectation of privacy in his movement." Counsel acknowledged that defendant was on parole and as such he had a "reduced expectation of privacy." Counsel also conceded that "by nature of the parole agreement that Mr. LeFlore and any other parolee is made to sign, they consent to searches of their person, their property, or their residence under their control." Counsel argued that in *Wilson*, the Illinois Supreme Court "goes on to point out that while a parolee has no legitimate expectation of privacy in his residence, it does qualify at least when the parolee is present." (As I will later discuss, this is not an accurate reading of *Wilson* and such a limitation would severely limit the effectiveness of a parole search condition.) Counsel went on to argue, again without any authority, that the use of the GPS device "is an invasion not only of Mr. LeFlore's privacy, this is a massive invasion of any driver of that vehicle."

¶ 76    Before the State argued, the court asked the parties whether they could cite any case law "that touches on the fact that this may take place on public property where the person could be seen anyway." Defense counsel cited, as "persuasive" authority, *People v. Weaver*, 909 N.E.2d 1195 (N.Y. 2009). In *Weaver*, the court of appeals for New York held that under the New York constitution, a warrant was required for the use of a GPS device that was placed inside the bumper of *the defendant's* street-parked van. *Id.* at 1201.

¶ 77    The State then argued that defendant lacked standing because the car was owned by

_____

[2]The record refers to defendant's driver's license as being revoked at times, and at other times as being suspended. Further, defendant's driver's license abstract was not made part of the record.

[3]As the State acknowledges in its brief, although the parties and the trial court used the term "standing," we no longer use that term to describe a defendant's ability to challenge the use of a GPS device on fourth amendment grounds. See *Johnson*, 237 Ill. 2d at 89. Instead, the relevant inquiry is whether the person claiming the protections of the fourth amendment had a legitimate expectation of privacy in the place searched. *Id.*

-20-

another person, that defendant "had a suspended" driver's license, and that the police "did not know who was driving, who was even in the car on the day that the officers obtained information about that car. Its location, its speed, where it was at." The State argued that, as a suspended driver, defendant "had no legal basis to *** be in control of a motor vehicle upon the roads of Kane County." Second, the State argued that the use of the GPS device was not a search under the fourth amendment, citing *Garcia*, 474 F.3d 994. In *Garcia*, the Seventh Circuit held that GPS tracking "is not searching in Fourth Amendment terms." *Id.* at 997. In reaching this conclusion, the Seventh Circuit relied upon both *Knotts* and *Karo*, both of which involved the use of "beeper" technology by the police. Likewise, the State also relied upon *United States v. McIver*, 186 F.3d 1119 (9th Cir. 1999), which also recognized that the warrantless use of a GPS device was not a search under the fourth amendment. In *McIver*, the defendant acknowledged that he had no reasonable expectation of privacy "while on a public thoroughfare" (citing *Knotts*, 460 U.S. 276) but argued that the police committed a trespass by placing the device on *his* car while it was parked in his driveway. *Id.* at 1126.

¶ 78    Finally, the State argued that under *Wilson* defendant's status as a parolee allowed the police to conduct the GPS monitoring even if defendant had otherwise established standing and that the use of the GPS would otherwise require a warrant. The State argued that in *Wilson* the court decided that "because the parolee had a lower expectation of privacy that, combined with the high interest in curbing recidivism, that in situations where there is an individual who's actively on parole, a search of that individual's residence was going to be proper." The State pointed out that under *Wilson* "this search condition has no limitation on what government agent may perform the search or what purpose they may have."

¶ 79    In rebuttal, defense counsel argued that "as to the issue of standing" the Kia was connected to defendant from a recent arrest, that the registered owner was at the same address, and "Mr. LeFlore was the focus of the investigation."

¶ 80    After arguments were concluded, the trial court took the case under advisement. Upon ruling on the motion, rather than first addressing whether defendant had established a legitimate expectation of privacy in the vehicle, the court ruled that the use of the GPS tracking device here was not a search under the fourth amendment to the United States Constitution or under the Illinois Constitution. In announcing its ruling, the trial court cited *Karo* and *Knotts*, as well as *Garcia* and a Wisconsin case, *State v. Sveum*, 2009 WI App 81, 319 Wis. 2d 498, 769 N.W.2d 53. The trial court then cited to *McCoy* and *Bower* for the proposition that:

> "The defendant needed to demonstrate a right to control for the [*sic*], right to control and for the use of the Kia; *McCoy* and *Bower* case [*sic*] both address problem [*sic*] to challenge standing when someone is not the owner of the vehicle, does not have a legal right to use or drive the car, such as [a] suspended driver's license in this case."

¶ 81    Finally, the trial court stated that it "does not agree that defendant's parole status is applicable herein." The court apparently accepted defense counsel's argument at the hearing; it stated "I agree with the reasoning in *People v. Wilson*, cited by the defense, that the reduced expectation of privacy exists from, in the known presence of the parolee and under exigent circumstances, I don't find them to be existing in this case."

-21-

¶ 82    The facts developed at trial established that the robbery of the gas station was captured on video by a surveillance camera. The robber used what looked like a shotgun. He took the cash drawer and a carton of Newport cigarettes from the cashier and fled. The video showed that the robber was wearing a pair of "Steve Madden" athletic shoes. On the night of April 24, 2009, the police conducted a parole search of defendant's residence. Defendant arrived, driving the Kia, after the police had already arrived. Defendant was then taken into custody for driving on a revoked license. He was wearing "Steve Madden" athletic shoes, which have a distinctive striping pattern on them. During the search, the police recovered at least one package of cigarettes that had the gas station's stamp on them. They also recovered a hollow black metal cane that had the rubber tip removed from the end. When defendant was interviewed, the police told him that he was under surveillance but did not tell him about the use of the GPS device. He was also told that the apartment complex video camera showed "them" leave the building early in the morning. After the police placed the cane in the interview room, defendant confessed. He explained that he made the cane look like a gun by removing the rubber stopper on the end and placing a black grocery-type bag around the center. Defendant said that Powell beat him up, that she wanted some money, and that she drove the car. He maintained that the robbery was Powell's idea. Defendant was also picked out of a photo lineup by the cashier.

¶ 83    While this case was on appeal, the United States Supreme Court decided *United States v. Jones*, 565 U.S. ___, 132 S. Ct. 945 (2012), which resolved any dispute as to whether the attachment of a GPS device by the police to an individual's vehicle and subsequent use of the device to monitor the vehicle's movements was a search under the fourth amendment. Also while this case was on appeal, the Supreme Court decided *Davis v. United States*, 564 U.S. ___, 131 S. Ct. 2419 (2011). In *Davis*, the court applied the good-faith exception to the exclusionary rule to searches by the police in "objectively reasonable reliance" on binding judicial precedent. Prior to oral argument, the State submitted *Jones* as additional authority, and we directed the parties to address whether the *Davis* good-faith exception applied.

¶ 84    The Supreme Court of the United States has "on numerous occasions pointed out that cars are not to be treated identical with houses or apartments for Fourth Amendment purposes." *Rakas v. Illinois*, 439 U.S. 128, 148 (1978). Yet, my colleagues have concluded that defendant, who is a parolee with a revoked license, could on remand establish a legitimate expectation of privacy in a vehicle that he did not own, did not use for storage of any personal effects, and had driven only "from time to time" in the past. The majority attempts to distinguish the "one-time" warrantless search of a parolee's bedroom in *Wilson* from the 24-hour GPS search in this case, saying "defendant and Powell here were subjected to continuous, surreptitious, and potentially indefinite GPS monitoring." *Supra* ¶ 40. Powell's fourth amendment rights are not at issue and defendant may not vicariously assert her rights in seeking to exclude evidence. *Rakas*, 439 U.S. at 130-50. What might have occurred is not at issue.

¶ 85    On appeal, defendant argues that he maintained a reasonable expectation of privacy "in Powell's car." First, he argues that "the car was registered to [his] girlfriend." There was no testimony at the hearing that Powell was defendant's girlfriend and defendant provides no such citation to the record. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (arguments shall

contain "citation of the authorities and the pages of the record relied on"). Defendant goes on to argue that "as somebody with *permission* and *authority* to drive Powell's car," he "had the right to possess and exclude others from that vehicle." (Emphases added.) Again, there was no such testimony at the hearing and defendant has provided no citation to the record.[4] Defendant asserts that "[m]oreover, he possessed a *reasonable* expectation that his privacy would not be infringed upon by the government tracking his movements through GPS technology, simply because he was driving his girlfriend's car. Accordingly, despite the fact that defendant was not the registered owner of the car, he had a reasonable expectation of privacy in the car and in his movements." (Emphasis added.) Defendant cites no authority for this proposition. The only case defendant cites in his brief on the issue of his expectation of privacy is *People v. Juarbe*, 318 Ill. App. 3d 1040 (2001). *Juarbe* does not support defendant's argument. In that case, the defendant and his codefendant, Soto, were convicted of possession of a controlled substance with the intent to deliver. Soto was a passenger in a vehicle being driven by the defendant. After a traffic stop, the defendant consented to a search of the vehicle, which revealed nothing. The police then called for a canine unit. The canine alerted on the rear door of the vehicle. A search of hidden compartments revealed a large quantity of controlled substances. The court restated the general rule that "a passenger lacks standing to challenge the search of another's vehicle unless the passenger has a legitimate expectation of privacy in the place searched." *Id.* at 1050. As the *Juarbe* court explained, "[t]he inquiry involves two questions: (1) whether the individual, by his conduct, has exhibited a subjective expectation of privacy; and (2) whether such an expectation is justifiable under the circumstances." *Id.* (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). The court then discussed factors that have been recognized as relevant in answering these questions. Soto had no possessory interest in the vehicle and there was no evidence that he had a right to exclude others from the vehicle. Therefore, the court concluded that Soto lacked standing to challenge the search. *Id.* Defendant in this case is in no better position than Soto. In addition to the factors considered in rejecting Soto's standing argument, defendant here could not legally drive the vehicle because his license was revoked. Further, as a parolee, defendant had no expectation of privacy in his movements. In his attempt to establish an expectation of privacy in the vehicle, the only facts defendant cites that can be found in the record are that the "GPS system was affixed to a car he was known to drive" and that "the sole purpose of placing the tracking device under the car was to monitor the defendant's movements." There was no evidence presented as to when defendant was last allowed to drive the vehicle, whether he possessed his own set of keys, whether he kept or stored any items in the vehicle, or whether he ever paid for insurance or upkeep on the vehicle.

¶ 86   Defendant concludes this portion of his argument by asserting that "[m]oreover, he possessed a reasonable expectation that his privacy would not be infringed upon by the government tracking his movements through GPS technology *simply because he was driving his girlfriend's car*." (Emphasis added.) Once again, defendant cites no authority for this

---

[4]In his reply brief, defendant repeatedly refers to Powell as his "live-in girlfriend" but again fails to provide any citation to the record.

proposition, and it should be deemed forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013). Defendant's argument is premised on the "target theory" of standing that has been rejected by the Supreme Court of the United States and the Illinois Supreme Court. See *Rakas*, 439 U.S. 128; *People v. Keller*, 93 Ill. 2d 432, 433-40 (1982). In *Rakas*, the Supreme Court cautioned against "[c]onferring standing to raise vicarious Fourth Amendment claims." *Rakas*, 439 U.S. at 137. Doing so would mean more widespread invocation of the exclusionary rule, which "exacts a substantial cost for the vindication of Fourth Amendment rights." *Id*.

¶ 87    I agree with the majority's observation that possessory-interest and expectation-of-privacy elements are relevant to the analysis of whether defendant in this case has established a "legitimate" expectation of privacy in the searched property, Powell's vehicle. *Supra* ¶ 16. As Justice Sotomayor said in her concurring opinion in *Jones*, "[a]wareness that the [g]overnment may be watching chills associational and expressive freedoms." *Jones*, 565 U.S. at ___, 132 S. Ct. at 956 (Sotomayor, J., concurring). Justice Sotomayor joined the majority in *Jones* because the trespass analysis provided a "narrower basis for decision." *Id.* at ___, 132 S. Ct. at 958 (Sotomayor, J., concurring). In his concurring opinion in *Jones*, Justice Alito explained that "Congress and most States have not enacted statutes regulating the use of GPS tracking technology for law enforcement purposes. The best that we can do in this case is to apply existing Fourth Amendment doctrine and to ask whether the use of GPS tracking in a particular case involved a degree of intrusion that a reasonable person would not have anticipated." *Id.* at ___, 132 S. Ct. at 964 (Alito, J., concurring, joined by Ginsburg, Breyer and Kagan, JJ.). Using the "expectation of privacy" test from *Katz v. United States*, 389 U.S. 347 (1967), Justice Alito noted that "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable." *Id.* at ___, 132 S. Ct. at 964 (Alito, J., concurring, joined by Ginsburg, Breyer and Kagan, JJ.) (citing *Knotts*, 460 U.S. at 281-82). However, Justice Alito said, "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *Id.* at ___, 132 S. Ct. at 964 (Alito, J., concurring, joined by Ginsburg, Breyer and Kagan, JJ.). He concluded that the tracking became a search before the four-week mark, but chose not to identify precisely when. *Id.* at ___, 132 S. Ct. at 964 (Alito, J., concurring, joined by Ginsburg, Breyer and Kagan, JJ.). In this case, the monitoring was for less than 25 hours, which clearly does not constitute the "lengthy monitoring" that would require a fourth amendment reasonableness analysis contemplated by the concurring justices in *Jones*.

¶ 88    With all due respect to my colleagues, *Jones* did not in any way change the requirement that in order to challenge a search, a defendant must demonstrate his own legitimate expectation of privacy in the place searched. In *Jones*, the vehicle was registered to Jones's wife, but the government conceded that, although he was not the owner, Jones was the exclusive driver. As such, "he had at least the property rights of a bailee." *Id.* at ___ n.2, 132 S. Ct. at 949 n.2. (majority opinion). Furthermore, in *Jones* the government did not challenge Jones's ability to make a fourth amendment objection. *Id.* at ___ n.2, 132 S. Ct. at 949 n.2. That is not the case here. The State vigorously contested defendant's claim that he had a legitimate expectation of privacy.

¶ 89    The majority relies on federal cases to support the view that defendant "would have standing under *Jones*" to challenge the use of the GPS device. *Supra* ¶ 29. Of course, while lower federal decisions are not binding on state courts, they may be considered as persuasive authority. See *People v. Nash*, 409 Ill. App. 3d 342, 352 (2011). There is no need to rely on federal cases, however, because decisions of the Illinois Supreme Court guide us in determining whether a defendant has established a legitimate expectation of privacy in the place searched or the property seized. The question of whether defendant here established a legitimate expectation of privacy in Powell's vehicle is answered in light of the totality of the circumstances in this case. *People v. Kidd*, 178 Ill. 2d 92, 136 (1997). Whether defendant had a legitimate expectation of privacy in Powell's vehicle is "measured by an objective standard drawn from common experience." *Id.* at 135. The Illinois Supreme Court has identified several factors that are to be considered "in determining whether a defendant has a legitimate expectation of privacy in the place searched or the property seized: (1) property ownership, (2) whether the defendant was *legitimately present* in the area searched, (3) the defendant's possessory interest in the area searched or the property seized, (4) prior use of the area searched or the property seized, (5) ability to control or exclude others' use of the property, and (6) a subjective expectation of privacy in the property." (Emphasis added.) *People v. Rosenberg*, 213 Ill. 2d 69, 78 (2004) (citing *People v. Johnson*, 114 Ill. 2d 170, 191-92 (1986)). In order to claim a violation of the fourth amendment, the defendant's subjective expectation of privacy must be one that "society recognizes as reasonable." (Internal quotation marks omitted.) *Jones*, 565 U.S. at ___, 132 S. Ct. at 954-55 (Sotomayor, J., concurring) (citing *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979), and *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

¶ 90    Examining the relevant factors enumerated in *Rosenberg*, it is clear that during the hearing on the motion to quash and suppress defendant established the existence of only one factor, his prior use of the vehicle. In *Johnson*, the Illinois Supreme Court rejected the defendant's argument that his past use of his stepfather's truck, six months before its seizure, was sufficient to show he had a reasonable expectation of privacy "in view of the lack of any other evidence of a reasonable privacy expectation." *Johnson*, 114 Ill. 2d at 192. Here, while defendant's past use of Powell's car was closer in time to the search, he failed to establish his presence in, or possession of, Powell's car when the GPS was placed on the vehicle or, for that matter, when it was used to track the vehicle's movements.

¶ 91    The federal cases cited by the majority provide no support for defendant's claim that he exhibited a legitimate expectation of privacy in Powell's car at the time of the search (placement of the GPS device and continued monitoring of the car's movements). In *Batista*, the district court concluded that, "[a]lthough the issue is a close one, it is reasonable to conclude that at the time of the placement of the GPS device, Albert Batista was in possession of the Intrepid." *Batista*, 2013 U.S. Dist. LEXIS 28710, at *14. The district court noted that the government's argument that the mere presence of the Intrepid in Albert Batista's apartment complex parking lot did not suggest a possessory interest, was undercut by the fact that a GPS device was placed on the Celica parked outside Alex Batista's workplace the same night. In this case, there was no evidence presented at the hearing that defendant had a possessory interest in Powell's car on either April 23 or April 24, 2009. It

-25-

is worth noting that, although the district court found that Albert Batista had standing, the court found that "the exclusionary rule does not warrant the suppression of the evidence in this case, because the good faith exception to the Fourth Amendment warrant requirement applies." *Id.* at \*16. The court explained that "[a]t the time the GPS tracking device was placed on the car on January 4, 2012, numerous federal courts had approved warrantless installation and monitoring of GPS devices on vehicles that remained on public roads, relying on, in part, the Supreme Court's holdings in *United States v. Knotts* and *United States v. Karo*." *Id.* at \*21. Although no Fourth Circuit case had addressed the issue, the court said that the officers "reasonably relied on the comprehensive body of case law when placing the GPS tracking device on the Intrepid without a warrant." *Id.* at \*24.

¶ 92        The majority also cites *Hernandez* for the proposition that, if defendant was not in possession of the vehicle when the GPS was installed but later came into "lawful possession" by borrowing the vehicle while the device was still in place, he "has standing to challenge the use of the GPS device." (Emphasis omitted.) *Supra* ¶ 25; see *Hernandez*, 647 F.3d at 219. In *Hernandez*, the government did "not dispute that Hernandez had permission" to drive the truck. That is not the case here. Also, while the *Hernandez* court found that the defendant had standing to challenge the use of the device, it also upheld the use of the device because the use was akin to the "beeper" cases. *Id.* at 216, 221. The same can be said in this case. Like in *Hernandez*, the police were not monitoring defendant at all times. *Id.* at 221.

¶ 93        In *Gibson*, the Eleventh Circuit found that the defendant, who had "paid for the insurance and maintenance of the Avalanche and often drove it," had standing to challenge the use of the tracking device while the vehicle was in his possession, but not when he was neither the driver nor a passenger. *Gibson*, 708 F.3d at 1277. The *Gibson* court explained that the defendant "has not established that he had a reasonable expectation of privacy in the Avalanche only when it was searched on February 20, 2009, because he was not the legal owner of the Avalanche, he has not established that he had exclusive custody and control of the Avalanche, and he was neither a driver of, nor a passenger in, the Avalanche when it was searched." *Id.* at 1278. Here, in addition to having a revoked driver's license and being a parolee, defendant's evidence at the hearing on the motion to quash and suppress suffered from the same deficiencies as *Gibson*'s did. Defendant failed to establish that, at the time of either the placement of the device or the tracking of the Kia, he had "exclusive custody and control" of the Kia. Of course, as to custody, defendant had the burden to establish that to the extent he ever had custody and control of the vehicle, he had it lawfully.

¶ 94        My colleagues are correct that a defendant can have a legitimate expectation of privacy in another's car if the defendant is in possession of the car, has permission from the owner, holds a key, and *has the right* and ability to exclude others, except the owner, from the car. See *United States v. Thomas*, 447 F.3d 1191, 1198 (9th Cir. 2006). However, none of these factors was established by defendant in this case. Additionally, the record demonstrates that, when defendant drove the car in the past, he had no legal right to do so, so he was not "legitimately present in the area searched." *Rosenberg*, 213 Ill. 2d at 78. The trial court, in ruling that defendant failed to establish standing, cited to *McCoy* and *Bower* "for the proposition that the defendant needed to demonstrate a right to control \*\*\* and for the use of the Kia." Like defendant in this case, the defendants in *McCoy* and *Bower* did not have

valid driver's licenses.

¶ 95        McCoy was a passenger in a rental car that was stopped for speeding. McCoy's co-defendant, Straight, was driving the vehicle. None of the occupants of the vehicle had a valid driver's license. McCoy told the police that he acquired the car from his " 'kinfolk.' " *McCoy*, 269 Ill. App. 3d at 593. The vehicle was towed and an inventory search conducted because no occupant could legally drive. In reversing the trial court's order granting McCoy's motion to suppress, the appellate court concluded that neither Straight nor McCoy had a legitimate expectation of privacy in the vehicle. The appellate court commented, "[a]ssuming he obtained the vehicle from some 'kinfolk,' it is doubtful they could have legitimately entrusted the vehicle to him as an unlicensed driver." *Id.* The court also noted that "[t]his is not a case where McCoy was in the vehicle with permission of the owner for a *long trip*." (Emphasis added.) *Id.* (citing *People v. Taylor*, 245 Ill. App. 3d 602 (1993) (passenger has an expectation of privacy in a car where belongings are stored when traveling for an extended period of time)).

¶ 96        In *Bower*, the defendant attempted to rent a vehicle at the San Diego airport. His application was denied due to an outstanding traffic ticket. The defendant then had his friend rent a car for him and then reimbursed his friend. The defendant was stopped two days later in Illinois by a state trooper. Because the defendant was not the named driver and not listed as an authorized driver, the vehicle was impounded and the contents were inventoried. In upholding the trial court's denial of the defendant's motion to suppress, the appellate court said that the defendant knew that his friend "had no authority to grant him possession of the car based upon defendant's unsuccessful attempt to rent a car from Hertz at the same location only 40 minutes earlier." *Bower*, 291 Ill. App. 3d at 1081.

¶ 97        Consistent with the reasoning in *McCoy* and *Bower*, the Seventh Circuit has likewise held that, where the defendant was an unlicensed driver, his "expectation of privacy was not reasonable." *Haywood*, 324 F.3d at 516. In *Haywood*, the defendant borrowed a rental car from his girlfriend, who had "given him permission to drive the car." *Id.* The defendant had just driven from Chicago to Peoria. After he parked in front of his house and got out of the car, he was greeted by two police officers who arrested him for driving on a revoked license. The court noted that there was a split among circuits on the issue of an unauthorized driver's standing to challenge a search where the authorized driver has given the defendant permission to drive the car. The *Haywood* court decided not to address that precise question, saying "[t]hat's because Haywood was not simply an unauthorized driver, he was also an unlicensed one." *Id.* The court said that the rental company would never have given the defendant permission to drive the car and as a result his "expectation of privacy was not reasonable." *Id.*

¶ 98        In this case, defendant and Powell both knew that defendant's driver's license was revoked. Even if Powell had given defendant permission to drive the car, she had no lawful authority to do so. 625 ILCS 5/6-304 (West 2010) (permitting an unauthorized person to drive is a criminal offense). As a revoked driver, defendant clearly had no legitimate expectation of privacy in Powell's vehicle or its movements. The majority discusses defendant's status as a revoked driver but concludes that "the law will be better served by considering defendant's status as a revoked driver after the parties provide a complete record

-27-

on remand." *Supra* ¶ 37. Respectfully, we have a complete record. Defendant's status as a revoked driver bears directly on "whether the defendant was legitimately present in the area searched." *Rosenberg*, 213 Ill. 2d at 78 (citing *Johnson*, 114 Ill. 2d at 191-92). The trial court properly considered this fact in examining the totality of the circumstances in this case.

¶ 99                    Defendant's Status as a Parolee

¶ 100    Defendant maintains that he "possesses a reasonable expectation of privacy in his movements." Defendant is not the hypothetical reasonable person to which the *Katz* privacy test looks; he is a parolee and as such had no reasonable expectation of privacy in his movements. Pursuant to section 3-3-7(c) of the Unified Code of Corrections (Code), defendant was served with and signed a written explanation of the conditions of his "parole or mandatory supervised release." See 730 ILCS 5/3-3-7 (West 2006). The form, received in evidence during the motion hearing, is entitled "Parole or Mandatory Supervised Release Agreement." The agreement specifies that "until final discharge, you shall at all times be under the legal custody of the Department of Corrections." Condition number 10 provides that "[y]ou shall consent to a search of your person, property or residence under your control." Defendant signed the form on December 29, 2007, acknowledging that he had "carefully read, or have had read to me, and I do clearly understand the contents and conditions of the above rules." The form further provides that "I also understand that I am being released pursuant to 730 ILCS 5/3-3-10, this agreement as herein stated is applicable to me." Section 3-3-10(c) provides that any person released under that section shall be subject to, among other sections, section 3-3-7 of the Code. 730 ILCS 5/3-3-10(c) (West 2006). Section 3-3-7(a)(10) of the Code provides that a condition of every parole and mandatory supervised release is that the subject "consent to a search of his or her person, property, or residence under his or her control." 730 ILCS 5/3-3-7(a)(10) (West 2006).

¶ 101    Defendant argues that, despite being on parole and having "a reduced expectation of privacy, parolees retain constitutional rights" and he cites to *Wilson*, 228 Ill. 2d at 44. He goes on to argue that the "agreement here indicates that defendant *consented* to a search of property under his control, but this agreement specifically limited 'electronic monitoring' of the defendant to 90 days from the December 29, 2007, agreement." (Emphasis added.) Defendant then claims that the agreement would lead "a reasonable defendant to conclude that he would only be electronically monitored during that 90-day period." The majority accepts this argument and concludes that "defendant had *an expectation* that, while he continued to be required to submit to searches of his person, property, or residence upon demand, he would not be surreptitiously monitored." (Emphasis added.) *Supra* ¶ 42. Respectfully, this argument has no merit. The question is not just what defendant subjectively thought, but whether that expectation is one that society recognizes as reasonable. The majority's analysis leads to an untenable conclusion, that although a parolee is in no position to object to a warrantless search of "his person, property, or residence" he may raise a fourth amendment objection to a search of another person's vehicle, which he uses to commit crimes, simply because he was not told what form of search might be employed.

-28-

¶ 102    The 90-day provision in the agreement was an additional requirement imposed by the Prisoner Review Board, likely because defendant was a recidivist having repeatedly violated parole conditions in the past. Further, electronic monitoring under the Code is "primarily intended to record or transmit information as to the defendant's presence or nonpresence in the home." 730 ILCS 5/5-8A-2(A) (West 2006). The use of such a device requires defendant's consent as well as notice to other persons residing in the home. 730 ILCS 5/5-8A-5 (West 2006). The fact that this added condition of defendant's parole had expired did not create a reasonable expectation that defendant's movements would not be monitored or that his person, property, or residence would not be subject to search. As the Illinois Supreme Court explained in *Wilson*, the search condition that a parolee accepts "has no 'limitation on what government agent may perform that search or what purpose they may have.' " *Wilson*, 228 Ill. 2d at 50 (quoting *People v. Moss*, 217 Ill. 2d 511, 532 (2005)). The purpose here was to investigate whether defendant was involved in the commission of burglaries while using Powell's vehicle. It took only a day and a few minutes to confirm that suspicion.

¶ 103    During the hearing on the motion to quash and suppress, defense counsel acknowledged that, as a parolee, defendant consented to searches of his person, property, or residence. As noted, counsel stated that *Wilson* "goes on to point out that while a parolee has no legitimate expectation of privacy in his residence, it does qualify at least when the parolee is present." The trial court accepted this representation and commented that "the reduced expectation of privacy exists from, in the known presence of the parolee and under exigent circumstances, I don't find them to be existing in this case." Both defense counsel and the trial court misread *Wilson*. At issue in *Wilson* was the nonconsensual, suspicionless search of a parolee/defendant's bedroom. The court discussed the fact that "many courts have held that there is no difference between the expectation of privacy a parolee has in his person and his residence, provided that the parolee has signed an agreement containing a search condition similar to defendant's search condition." *Id.* One of the cases the court cited was *United States v. Lopez*, 474 F.3d 1208 (9th Cir. 2007), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012). The *Wilson* court quoted a passage from *Lopez*:

> " '[I]f *** a parolee has no expectation of privacy in his person, we reason that a parolee has no legitimate expectation of privacy in his residence either, at least when the parolee is present. Any other rule would diminish the protection to society given by the search condition of parole, permitting search at any time.' " *Wilson*, 228 Ill. 2d at 51 (quoting *Lopez*, 474 F.3d at 1213).

¶ 104    The *Wilson* court noted that the officer did not ask the defendant for his consent to search. The officer, like Shufelt in this case, testified "that he felt neither a warrant nor defendant's consent was needed because defendant's MSR agreement constituted defendant's consent to any search of his person, property, or residence." *Id.* at 38-39. The court noted further that the search condition in that case had "since been codified in section 3-3-7(a) of the Unified Code of Corrections." *Id.* at 49 n.3. Just as the defendant in *Wilson* lost any "special protection" afforded to his residence "when he became a parolee and agreed to consent to a search of his residence in his MSR agreement" (*id.* at 52), defendant in this case clearly lost any special protection ordinarily afforded to an individual's movements.

¶ 105    In comparing the provisions of California's parole system at issue in *Samson v.*

*California*, 547 U.S. 843 (2006), to Illinois's system, the *Wilson* court commented that "[f]urther, we can find no appreciable differences between each state's operational process for entering a period of parole or for remaining on parole." *Wilson*, 228 Ill. 2d at 47. Prior to the Supreme Court's decision in *Jones*, the California Court of Appeals, Sixth District, decided *People v. Zichwic*, 114 Cal. Rptr. 2d 733 (Cal. Ct. App. 2001), a case involving a fact pattern similar to the instant case. In *Zichwic*, the defendant was on parole when he became a suspect in burglaries. The police installed a GPS tracking device on the defendant's pickup truck without a warrant. In upholding the placement of the device on the defendant's truck, the court said that "[a] warrantless search condition is a reasonable term of parole supervision, as it promotes the parolee's rehabilitation and protects the public against criminal behavior." *Id.* at 739. The court also noted that " '[t]he threat of a suspicionless search is fully consistent with the deterrent purposes of the search condition.' " *Id.* (quoting *People v. Reyes*, 968 P.2d 445, 450 (Cal. 1998)).[5]

¶ 106    In my view, the use of the GPS device in this case was consistent with the principle set forth in *Samson* and reiterated in *Wilson*, that " 'a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment.' " *Wilson*, 228 Ill. 2d at 50-51 (quoting *Samson*, 547 U.S. at 853).

¶ 107                                    Good Faith

¶ 108    On this court's own motion, prior to oral argument, we directed the parties to be prepared to discuss the Supreme Court's decision in *Davis* "as it relates to the defendant's argument that the GPS tracking device evidence should have been suppressed by the trial court." At oral argument, the State argued that the good-faith exception to the exclusionary rule should be applied because at the time of the search the only binding precedents in Illinois were *Knotts* and *Karo*. The defense argued that the good-faith exception should not apply, because *Knotts* and *Karo* involved "beepers," not the more advanced GPS technology used in *Jones* and in this case.[6]

¶ 109    Of course, it is not my responsibility to address the State's good-faith argument, because, in my view, defendant failed to establish a legitimate expectation of privacy in Powell's vehicle under either approach recognized in *Jones*.

¶ 110    My colleagues have chosen not to rule on the State's good-faith argument. The Illinois Supreme Court has stated that "[i]n order to develop and maintain a coherent body of law, it is imperative that reviewing courts set forth their rationale and discuss the relevant case law pertaining to the issue in a given case." *Siegel v. Levy Organizational Development Co.*, 153 Ill. 2d 534, 544 (1992). We directed the parties to argue *Davis* at oral argument. The

_____

[5]The court's alternative holding that the placement of the device was not a search is no longer good law under *Jones*.

[6]Oral arguments were conducted at Northern Illinois University Law School. Unfortunately, the arguments were not electronically recorded.

State relied on *Knotts* and *Karo* as well as *Garcia*. The defense argued that *Knotts*, *Karo*, and *Garcia* were not binding precedent, because the tracking device here was a GPS, not a "beeper" as in *Knotts* and *Karo*. *Garcia* is a lower federal court opinion and is therefore not binding on Illinois courts.

¶ 111　　Had my colleagues chosen to address the State's good-faith argument, I am quite sure they would not require suppression of the GPS tracking evidence in this case. "Whether the exclusionary sanction is appropriately imposed in a particular case *** is 'an issue separate from the question [of] whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.' " *United States v. Leon*, 468 U.S. 897, 906 (1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983)).

¶ 112　　In *Davis*, the Supreme Court held that the good-faith exception to the exclusionary rule provides that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis*, 564 U.S. at ___, 131 S. Ct. at 2423-24. On April 23, 2009, there were no reported decisions from Illinois courts on the issue of whether the warrantless use of a GPS device to track the movements of an individual's vehicle violated the Fourth Amendment. In fact, there were no Illinois reviewing court cases involving the use of "beepers" by law enforcement to track vehicle movements. Prior to *Jones*, the majority of both state and federal courts of review found that GPS tracking devices were simply the next generation of tracking technology from the radio transmitter "beepers" in *Knotts* and *Karo*, and they upheld the warrantless use of the devices to track the public movements of vehicles. See *United States v. Cuevas-Perez*, 640 F.3d 272, 273 (7th Cir. 2011) ("[t]he foundational Supreme Court precedent for GPS-related cases is *United States v. Knotts*, 460 U.S. 276 *** (1983)"), *vacated and remanded*, ___ U.S. ___, 132 S. Ct. 1534 (2012); *Sveum*, 2009 WI App 81, ¶ 8, 319 Wis. 2d 498, 769 N.W.2d 53 (noting that the seminal cases on this topic were *Knotts* and *Karo*). "So far, courts around the country faced with warrantless use of GPS issues have relied on the reasoning from older 'beeper cases' ***." Ramya Shah, *From Beepers to GPS: Can the Fourth Amendment Keep Up With Electronic Tracking Technology?*, 2009 U. Ill. J.L. Tech. & Pol'y 281. Since the *Jones* decision, the majority of the courts that have addressed the warrantless use of GPS devices pre-*Jones* have applied the good-faith exception recognized in *Davis*. See *United States v. Sparks*, 711 F.3d 58 (1st Cir. 2013); *Kelly v. State*, 56 A.3d 523 (Md. Ct. Spec. App. 2013); *State v. Copeland*, 2013 WI App 94, 835 N.W.2d 291 (table).

¶ 113　　My colleagues cite *United States v. Lee*, 862 F. Supp. 2d 560, 569 (E.D. Ky 2012), to suggest that the question of whether the warrantless use of a GPS device violated the fourth amendment remained unsettled on April 23, 2009. *Supra* ¶ 45. The district court in *Lee* was discussing the split among the federal circuits regarding the warrantless use of GPS devices at the time the agents in that case used a GPS device. The court pointed out that the agents were following "a national DEA policy" rather than binding precedent from the Sixth Circuit, which had not yet ruled on the question. *Lee*, 862 F. Supp. 2d at 570. What my colleagues forget is that the GPS device in *Lee* was used in September 2011. In this case, the device was used in April 2009. At that time, there was no split among the circuits. As the district court in *United States v. Oladosu*, 887 F. Supp. 2d 437, 445 (D.R.I. 2012) (citing *United States v. Baez*, 878 F. Supp. 2d 288, 294-95 (D. Mass. 2012)) explained, the law in the federal courts

regarding the warrantless use of GPS devices first became unsettled as a result of the District of Columbia Circuit's opinion in *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010). As the *Oladosu* court observed, "[a]t the time Detective DiFilippo attached the GPS to Defendant Oladosu's car [February 12, 2010], the United States Supreme Court had sanctioned the use of beeper technology without a warrant, and two circuits had ruled, in what appeared to be a growing consensus, that the beeper precedent was analogous and applicable to GPS use." *Oladosu*, 887 F. Supp. 2d at 448. Thus, in the instant case, at the time Shufelt placed the device on Powell's car, the law appeared to be settled that the fourth amendment permitted the warrantless use of a GPS device to track a suspect's public movements in a vehicle. The only case cited by defendant during the hearing on his motion was *Weaver*, 909 N.E.2d 1195, which was decided on state constitutional grounds.

¶ 114    Suppression of the GPS evidence in this case is at odds with the Supreme Court's reasoning in *Davis*. The Court said, "[w]e abandoned the old, 'reflexive' application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits." *Davis*, 564 U.S. at ___, 131 S. Ct. at 2427. I submit that we should be doing the "more rigorous weighing."

¶ 115    In its ruling in *Knotts*, the Supreme Court remarked, "[n]othing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case." *Knotts*, 460 U.S. at 282. My colleagues acknowledge that there were no Illinois cases on warrantless GPS searches or even any Illinois "beeper" cases. As my colleagues assuredly must know, in the absence of controlling authority from Illinois courts, even *obiter dicta* from the Supreme Court may be considered binding precedent. See *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 282 (2009). By its comments, the trial court in this case considered *Knotts* and *Karo* binding precedent. It was correct to do so.

¶ 116                                            Conclusion

¶ 117    I agree with my colleagues that defendant's convictions must be reversed and the cause remanded for a new trial. I do not agree that the trial court's order denying defendant's motion to quash his arrest and suppress evidence should be disturbed, because defendant failed to establish a legitimate expectation of privacy in Powell's vehicle and, even if he had done so, the good-faith exception to the exclusionary rule would apply.